**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HEIDI FENTON and ASHIKA SINGH, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>      v.<br><br>THE ALLSTATE CORPORATION, ALLSTATE INSURANCE COMPANY, ALLSTATE VEHICLE AND PROPERTY INSURANCE COMPANY, ARITY, LLC, ARITY 875, LLC, and ARITY SERVICES, LLC,<br><br>               Defendants. | Case No.:<br><br>Jury Trial Demanded<br><br>CLASS ACTION COMPLAINT |

Plaintiffs Heidi Fenton and Ashika Singh ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against the Allstate Corporation, Allstate Insurance Company, Allstate Vehicle and Property Insurance Company (collectively, "Allstate Defendants"), Arity, LLC, Arity 875, LLC, and Arity Services, LLC (collectively, "Arity Defendants" and collectively with Allstate Defendants, "Defendants"), to obtain damages, restitution, and injunctive relief for the Classes, as defined below, from Defendants. Defendants' actions violated the Federal Wiretap Act, the Computer Fraud and Abuse Act, the Stored Communications Act, and the Fair Credit Reporting Act. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

1

## NATURE OF ACTION

1.      Plaintiffs bring this class action against Defendants for illicit surveillance of insureds and invasion of their clients' privacy by collecting data on their clients' location and driving habits, surreptitiously, and without clients' consent.

2.      Unbeknownst to consumers, Defendants, through various subsidiaries and affiliates, conspired to secretly collect and sell "over two trillion miles" of over 45 million Americans' "driving behavior" data from mobile devices, in-car devices, and vehicles.[1]

3.      Defendants used the illicitly obtained data to, in their own words, build the "largest driving behavior dataset tied to insurance claims[,]" for two main purposes: (1) to support Allstate Defendants' car insurance business, including relative to under-writing and coverage decisions, and (2) profit from selling the driving behavior data to third parties, including other car insurance carriers ("Insurers").[2]

4.      Defendants achieved these goals by developing software and integrating their software into third-party apps to directly pull a litany of valuable data directly from consumers' mobile phones, including a phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data, which monitors details such as the phone's altitude, longitude, latitude, bearing, GPS time, speed, and accuracy ("Driving Data").

5.      To encourage app developers to adopt Defendants' software, Defendants paid app developers millions of dollars to integrate Defendants' software development kits ("SDKs") into their apps. Defendants further incentivized software developer usage of their SDK by creating generous bonus incentives for increasing the size of their dataset.

---

[1] ARITY, https://arity.com/ (last visited Feb. 10, 2025).
[2] *Id.*

6. Generally, SDKs provide app developers with tools to build and develop their apps. SDKs usually consist of a set of tools (APIs, software, etc.) with preprogrammed functions that are integrated into an app and operate in the background, thereby helping developers more efficiently program their app. However, developers may not know the full extent and functions of the code in the SDKs they imbed in their app.

7. According to Defendants, the apps that integrate their SDK allow them to "capture[] [data] every 15 seconds or less" from "40 [million] active mobile connections."[3]

8. Once collected, Defendants found several ways to monetize the ill-gotten Driving Data, including by selling access to the Driving Data to other insurers and using the data for Allstate Defendants' own insurance underwriting and coverage decisions. If a consumer requested a car insurance quote or had to renew their coverage, Insurers would access that consumer's driving behavior in Defendants' database. Insurers then secretly used that consumer's data to justify increasing their car insurance premiums, deny them coverage, and/or drop them from coverage altogether.

9. Defendants marketed and sold the data obtained through third-party apps as "driving" data reflecting consumers' driving habits, despite the data being collected from and about the location of a person's phone. More recently, however, Defendants have begun purchasing data about vehicles' operation directly from car manufacturers. Defendants ostensibly did this to better account for their inability to distinguish whether a person was driving based on the location and movements of their phone. The manufacturers that Defendants purchased data from included

---

[3] *Real Time Insights*, ARITY, https://arity.com/solutions/real-time-insights/ (last visited Feb. 10, 2025).

Toyota, Lexus, Mazda, Chrysler, Dodge, Fiat, Jeep, Maserati, and Ram. Allstate Defendants have used this data for their own insurance underwriting purposes.

10. Consumers did not consent to and were unaware of Defendants' collection and sale of their Driving Data. Pursuant to their agreements with app developers, Defendants had varying levels of control over the privacy disclosures and consent language that app developers presented and obtained from consumers. However, Defendants never informed consumers about their extensive data collection, nor did Defendants obtain consumers' consent to engage in such data collection. And Defendants never informed consumers as to how they would analyze, use, and monetize their sensitive data.

11. The putative Class is comprised of millions of Americans who were never informed about, and never consented to, Defendants' continuous collection and sale of their Driving Data. Through this action, Plaintiffs and Class Members seek damages for the losses suffered as a result of Defendants' misconduct, as well as injunctive relief aimed at preventing Defendants from engaging in such practices in the future.

**PARTIES**

12. Plaintiff Heidi Fenton is, and has been at all relevant times, a resident of Pennsylvania. Plaintiff Fenton was a longtime client of Defendant Allstate Corporation, from whom she had purchased auto insurance, until 2023. Plaintiff Fenton has used the Life360, SiriusXM, and Fuel Rewards apps on her mobile device. Plaintiff Fenton never gave consent to and was never notified that her Driving Data was shared with Defendants and/or third parties. Defendant Allstate Corporation notified Plaintiff Fenton that her rate would increase by approximately $700.00. Defendant Allstate Corporation did not cite to Plaintiff Fenton's driving

behavior as a reason for the increase. Plaintiff Fenton subsequently switched auto insurance providers, but experienced the same exorbitant rate increases with other Insurers.

13.     Plaintiff Ashika Singh is, and has been at all relevant times, a resident of North Carolina. Plaintiff Singh was a longtime client of Defendant Allstate Corporation, from whom she had purchased auto insurance, until 2022. Plaintiff Singh has used the Life360 app on her mobile device. Plaintiff Singh never gave consent to and was never notified that her Driving Data was shared with Defendants and/or third parties. Defendant Allstate Corporation notified Plaintiff Singh that her rate would nearly double, from approximately $200.00 per month to approximately $400.00 per month. Defendant Allstate Corporation did not cite to Plaintiff Singh's driving behavior as a reason for the increase. Plaintiff Singh subsequently switched auto insurance providers.

14.     Defendant Allstate Corporation is a United States public corporation headquartered in Glenview, Illinois, and incorporated under the laws of Illinois. Together with its subsidiaries, Defendant Allstate Corporation provides insurance products, including car insurance, throughout the United States.

15.     Defendant Allstate Insurance Company is a wholly owned subsidiary of The Allstate Corporation and is headquartered in Northbrook, Illinois, and incorporated under the laws of Illinois. Defendant Allstate Insurance Company provides insurance products, including car insurance, throughout the United States.

16.     Defendant Allstate Vehicle and Property Insurance Company is a subsidiary of The Allstate Corporation and is headquartered in Northbrook, Illinois, and incorporated under the laws of Illinois. Defendant Allstate Vehicle and Property Insurance Company provides insurance products, including car insurance, throughout the United States.

17.     Defendant Arity, LLC, was founded by The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Its headquarters is in Chicago, Illinois, and it is incorporated under the laws of Delaware. Defendant Arity, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant Allstate Corporation, collects and analyzes data obtained throughout the United States, and uses predictive analytics to build solutions to sell to third parties.

18.     Defendant Arity 875, LLC, was founded by The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Its headquarters is in Northbrook, Illinois, and it is incorporated under the laws of Delaware. Upon information and belief, the LLC's members, including Allstate, Alexandra Band, Christopher Belden, Jennifer Brown, Julie Cho, Eric Ferren, Amit Goswami, Suren Gupta, Gary Hallgren, Christina Hwang and Lisa Jillson, are all citizens of Illinois. Defendant Arity 875, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant Allstate Corporation, collects and analyzes data obtained throughout the United States, and uses predictive analytics to build solutions to sell to third parties.

19.     Defendant Arity Services, LLC, was founded by The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Its headquarters is in Northbrook, Illinois, and it is incorporated under the laws of Delaware. Upon information and belief, the LLC's members, including Allstate, Alexandra Band, Christopher Belden, Jennifer Brown, Julie Cho, Eric Ferren, Amit Goswami, Suren Gupta, Gary Hallgren, Christina Hwang and Lisa Jillson, are all citizens of Illinois.  Defendant Arity Services, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant Allstate Corporation, collects and analyzes

data obtained throughout the United States, and uses predictive analytics to build solutions to sell to third parties.

20.    Each of the Defendants acted jointly to perpetrate the acts described herein. At all times relevant to the allegations in this matter, each of these Defendants acted in concert with, with the knowledge and approval of, and/or as the agent of the other Defendant within the course and scope of the agency, regarding the acts and omissions alleged.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregated claims of the individual class members exceed $5,000,000.00, exclusive of interest and costs, and all conditions are met. Plaintiffs, and a large number of Class Members, are citizens of states different from the Defendants.

22.    This Court has jurisdiction over the Defendants because Defendants have sufficient minimum contacts with Illinois, including but not limited to their continuous and systematic business activities within the state.

23.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

24.    Defendants have accumulated the Driving Data from "130M+ average daily trips from 45M+ active geographically dispersed consumer connections", meaning more than 45 million Americans, including Plaintiffs.[4] Defendants acquired this data without consumers' knowledge by developing and integrating an SDK—specifically, the Arity Driving Engine SDK

---

[4] *Vehicle Miles Traveled*, ARITY, https://arity.com/solutions/vehicle-miles-traveled/ (last visited Feb. 10, 2025).

("Arity SDK")—into various mobile apps that enabled them to collect data directly from users' phones.

25.     Defendants have monetized Class Members' Driving Data in a variety of ways, including by creating the "largest driving behavior dataset tied to insurance claims"[5] and selling access to this data to other Insurers.

26.     Defendants never notified Plaintiffs and Class Members, nor did they obtain their consent, to collect or sell their Driving Data.

I.      **Defendants Developed Software to Covertly Collect Consumers' Location Data**

27.     Allstate Defendants, through their affiliate Arity, designed the Arity SDK in 2015, so that it could be integrated into mobile phone applications under the pretext of providing necessary functionality. Defendants engine are the Arity SDK to collect immense amounts of highly detailed Driving Data.

28.     Once incorporated into mobile app, the Arity SDK collected several types of data, including but not limited to:

    a.     a mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

    b.     "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

    c.     "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

---

[5] ARITY, https://arity.com/ (last visited Feb. 10, 2025).

d.   "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

e.   Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

29.   The data collected and/or intercepted by the Arity SDK includes a vast array device information, including IP addresses, browser and device information, user IDs, geolocation data, and more. As a result, the Driving Data is effectively de-anonymized when aggregated with consumers' unique device IDs and additional PII associated with those device IDs.

30.   For instance, a Mobile Advertising ID ("MAID") is a unique identifier assigned to a consumer's mobile device to assist marketeers in delivering advertisements to consumers. While consumers have the option to change their MAID, doing so requires them to proactively reset the MAID on the consumer's mobile device,. As a result, MAIDs can be used to track and identify consumers across the internet and associate aggregate data collected about them in one place with data generated elsewhere.[6]

31.   While some consumers may try to disable MAID tracking on their devices, app developers can still generate unique user identifiers known as the "Identifier for Vendors" (IDFV), which are specific to their applications.

32.   An IDFV is a unique identifier that remains consistent across all apps created by the same developer. This means that the apps from the same developer, running on the same device, shares the same IDFV, enabling cross-promotional iOS campaigns for iPhone users.

---

[6] On iPhones, the MAID is referred to as an IDFA; on Androids, a GAID.

33.     After collection, Defendants use the aggregated, de-anonymized Driving Data to "fingerprint" consumers and build detailed profiles of consumers for Defendants' benefit, deriving revenue from the use and sale of this data to third parties.

34.     . Defendants never informed consumers that they were collecting their data via the Arity SDK and the apps.

## II.     Defendants Paid App Developers to Integrate the Arity SDK into Mobile Apps

35.     Since at least 2017, Defendants have been "licensing" the Arity SDK by paying app developers millions of dollars to embed the Arity SDK into their mobile apps. On information and belief, to avoid alerting consumers to their data collection, Defendants specifically sought to partner with apps that already depended on location data for core functionality before entering into agreements with those apps.

36.     Defendants integrated Arity SDK into widely popular apps, such as: Routely,[7] Life360, GasBuddy, Sirius XM, and Fuel Rewards.

37.     Once an app is integrated the Arity SDK, the user was unwittingly enabling Defendants to collect the Driving Data via the Arity SDK.

38.     Under their agreements with the app developers, Defendants owned any Driving Data they collected from an app user and were permitted to use the Driving Data for their own independent purposes. Additionally, Defendants agreed to license or transfer subsets of the Driving Data to the app developers to use to support specific features in their apps, such as displaying a summary of a user's trip and fuel efficiency.

---

[7] Defendants now own the Routely app. *See Routely*, ARITY, https://arity.com/solutions/routely/ (last visited Feb. 10, 2025).

39.     In a further invasion of Plaintiffs' and Class Members' privacy, to allow Defendants to match specific individuals to the Driving Data using identifiers more specific than MAIDs or IDFVs, app publishers also licensed to Defendants other PII collected from their users, including, but not limited to, first and last name, phone number, address and zip code. Defendants could then aggregate this PII with the Driving Data to even more precisely identify the specific person whose information was intercepted and/or collected.

## III.     Defendants Purchased Driving Data from Car Manufacturers

40.     To further improve their Driving Data set and ameliorate some of the inherent inaccuracies in tethering driving behavior to phone location, Defendants also purchased car manufacturer data collected directly from consumers' vehicles.

41.     Car manufacturers such as Toyota, Lexus, Mazda, Chrysler, Dodge, Fiat, Jeep, and Maserati collect data through "connected" or "smart" vehicles.

42.     Defendants purchased this data, integrated the data into their database, and connected the data to individual profiles, and subsequently sold the data to third parties such as other Insurers, advertisers, and retailers.

43.     Defendants purchased and used consumers' data collected from car manufacturers without consumers' knowledge or consent.

44.     Plaintiffs will refer to the data collected into Defendants' database collectively herein as "Driver Data."

## IV.     Defendants Monetized Driving Data to the Detriment of Consumers

45.     Defendants monetize their ill-gotten Driver Data in various ways.

46.     First, Defendants use Driver Data for their own underwriting purposes. Based on the Driving Data for any given individual, Defendants may increase their premiums, decline to extend coverage, or drop an existing customer.

47.     Second, Defendants sell access to Driver Data and the profiles they construct based on the Driver Data. Defendants' products and services are marketed towards other Insurers, advertisers, and retailers. Defendants' products and services include:

a. **Drivesight**. In 2015, Allstate Defendants developed Drivesight to generate a driving score based on Defendants' own scoring model by analyzing data and generating driving scores that assign a particular value to an individual's driving risk.[8]

b. **ArityIQ**. Defendants let companies, including Insurers, access the Driver Data collected by Defendants and use that data to assign more accurate (and, more profitable) insurance rate quotes to individual consumers.[9]

c. **Arity Audiences**. Defendants let companies, including Insurers, "[t]arget drivers based on risk, mileage, commuting habits" and "[m]ore effectively reach [their] ideal audiences with the best offers to eliminate wasted spend, increase retention, and achieve optimal customer LTV." As part of this product, Defendants displayed ads to the users of apps that agreed to integrate the Arity SDK.[10]

---

[8] *Drivesight®*, ARITY, https://arity.com/solutions/drivesight/ (last visited Feb. 10, 2025).
[9] *Arity IQ^{SM}*, ARITY, https://arity.com/solutions/arity-iq/ (last visited Feb. 10, 2025).
[10] *Arity Audiences*, ARITY, https://arity.com/solutions/arity-audiences/ (last visited Feb. 10, 2025).

     d.    **Real Time Insights**. Defendants advertised that their business customers could "[r]eceive granular driver probe and event data for real-time applications."[11]

     e.    **Routely**. Defendants offer Routely to consumers as a "free" application which provides "helpful insights" into the consumers' driver data. By contrast, when marketing to Insurers, Defendants describe Routely as "telematics in a box" that Insurers can use to "more accurately identify drivers with riskier driving profiles based on actual driving data, provide personalized discounts or surcharges at renewal, promote safer driving habits, and improve retention of [their] safer drivers."[12]

48.    Defendants market their data products by emphasizing their ability to analyze consumers' "personalities," like how fast or risky they drive, "travel patterns," including whether they follow a regular commute, and "lifestyles," such as if they are "adventure seekers" or "busy multitaskers."[13]

49.    Defendants represent to advertisers that their products can "drive up your inventory's value, enabling advertisers to reach their best customers based on how, when, and where they drive."[14]

50.    For example, *Figure 1* depicts a sample driver's day-to-day travel patterns. According to the Defendants, these patterns can be used by quick service restaurants to offer

---

[11] *Real Time Insights*, ARITY, https://arity.com/solutions/real-time-insights/ (last visited Feb. 10, 2025).
[12] *Routely*, ARITY, https://arity.com/solutions/routely/ (last visited Feb. 10, 2025).
[13] *For mobile app publishers: Attract advertisers with driving data*, ARITY (Dec. 4, 2023), https://arity.com/move/for-mobile-app-publishers-attract-advertisers-with-driving-data/.
[14] *Id.*

breakfast deals to early morning commuters, or by retailers with travel products to reach people whose patterns show they're driving to and from the airport during the work week.[15]



*Figure 1 – Sample travel pattern for a hypothetical driver*

51. Similarly, Defendants can track data of trips taken around a retailer's location to effectively target customers in the area with personalized ads via their mobile apps to encourage them to visit the retailer, as depicted below in *Figure 2*.[16]



*Figure 2 – Data of trips taken in one week around a hypothetical retailer's location[17]*

---

[15] *Id.*
[16] *Case study: Boosting retail traffic with predictive mobility data*, ARITY (Feb. 15, 2024), https://arity.com/move/case-study-boosting-retail-traffic-with-predictive-mobility-data/.
[17] Yellow notes drivers who made visits to the retailer's locations; Teal indicates drivers that passed but did not stop at locations. *Id.*

**V.     Defendants' Lack of Privacy Disclosures**

52.     Defendants do not disclose their vast collection or monetization practices.

53.     Under their agreements with app developers, Defendants exercised varying levels of control over the privacy disclosures and consent language presented to consumers. However, neither Defendants, nor the apps running Defendants' Arity SDK on Defendants' behalf, informed Plaintiffs and Class Members that Defendants were collecting Driver Data. Neither Defendants, nor the apps on Defendants' behalf, inform Plaintiffs and Class Members of the various ways that Defendants would collect, use, and ultimately monetize the Driver Data.

54.     Due to Defendants' lack of disclosure, Plaintiffs and Class Members were wholly unaware that Defendants were collecting the Driver Data from their phone and/or their vehicles. Plaintiffs and Class Members were likewise wholly unaware that Defendants would use Driver Data to create and sell several different products and services to third parties, including other Insurers.

55.     Defendants filed to inform Plaintiffs and Class Members about their data collection and privacy practices and the mobile apps did not notify consumers about Defendants' practices on Defendants' behalf. Similarly, neither Defendants nor the mobile apps notified consumers of the ways in which their Driver Data would be used, nor did consumers agree to have their data used for Defendants' own products or services.

56.     For example, Gas Buddy asks users to enable location services merely to "help find the best gas prices."



**Enable Location Services**

Allow GasBuddy to use your location to help find the
best gas prices near you and to send you
personalized offers and location-based alerts. This
information may be collected while you are using the
app and in the background.  We will also share or
disclose your location with third parties, including our
business partners as described in our privacy policy,
to provide you with personalized offers.

**CONTINUE**

You can find out more about how your device's location is
used and disclosed in our privacy policy. You may also
revoke your consent or request that we limit our use or
disclosure of your location data at any time by clicking here.

*Figure 3 – By way of example, Gas Buddy Location Services Notice*

57.     While the notice indicates that Gas Buddy will "disclose your location with third parties," neither it nor the linked privacy policy get anywhere close to describing the volume of data that the Arity SDK collects, or the subsequent uses and monetization that Defendants engage in.

58.     Even if a Class Member took the extra step to investigate Defendants outside of their app, navigated to Defendants' website, and located their privacy disclosures, they would still not understand what Defendants did with their data. Consumers reading Defendants' privacy disclosures are met with a series of untrue and contradictory statements that do not reflect Defendants' true practices.

59.     For instance, Defendants state that they "do not sell personal information for monetary value,"[18] which is false. Defendants sold a number of data-based products and services for monetary value that linked a specific app user to their alleged driving behavior. Defendants further do not provide Class Members with the ability to request that Defendants stop selling their data.

60.     Defendants also misrepresented how they used Plaintiffs' and Class Members' data. In Defendants' privacy disclosures, Defendants state that they "[u]se [consumers'] personal data for analytics and profiling."[19] But in describing how Defendants "profile" consumers, Defendants fail to explain that they combine the Driving Data and Personal Data to create a database of driving profiles for more than 45 million Americans and selling access to said database. Rather Defendants describe their profiling activities as follows:

> We use your personal data to assist in our development of predictive driving models. We may profile [consumers'] personal data only for the purposes of creating a driving score ('Driving Score'), which is used for our analytics purposes to develop and validate our predictive driving models.[20]

61.     Even if a Class Member went to great lengths to tracking down Defendants' privacy statement, finding the subparagraph describing profiling, parsing through Defendants' convoluted description of their profiling activities, and concluding that they did not want Defendants to use their data to create a "Driving Score" about them, the Class Member still could do nothing to stop Defendants from collecting their data and creating a Driving Score. Defendants did not describe, nor did they provide, a method for a consumer to request that their data not be used to profile them.

---

[18] *Privacy statement*, ARITY (Nov. 1, 2024), https://arity.com/privacy/.
[19] *Id.*
[20] *Id.*

62. Likewise, if a Class Member concluded they did not want Defendants to use their data for targeted advertising, Defendants instructed them to "[l]earn how to opt out of targeted advertising including by opting out of the sharing or selling your personal information"[21] by visiting another link. However, upon clicking that link, the Class Member was taken to a page that—instead of offering them a way to submit a request to opt out of targeted advertising—only provided them with links to several third-party websites, such as the Apple Support Center. These third-party websites merely contained explanations regarding how a consumer could turn off certain types of targeted advertising and did not contain any way for a consumer to submit a request to Defendants specifically.

63. In summary, because Defendants did not disclose their conduct, consumers were wholly unaware that Defendants were collecting their Driver Data or that Defendants would use their Driver Data to create and sell different products and services to third parties, including Insurers.

## VI. Defendants' Practices Cause Substantial Injury to Consumers

64. As outlined herein, Defendants and their customers use the Driver Data Defendants collect to assess and underwrite automotive insurance policies, often increasing consumers' rates based on Driver Data collected without consumers' consent and that often does not reflect consumers' actual driving behaviors or habits.[22]

---

[21] *Id.*

[22] To illustrate, it was publicly reported that an individual's driving score was lowered because the "driving behavior" collected from his phone claimed he was driving when he was actually riding a roller coaster. Chad Murphy, *Sir, this is a roller coaster. Car insurance dings driving score for man riding The Beast*, CINCINNATI.COM (Oct. 8, 2024 6:18 AM), https://www.cincinnati.com/story/entertainment/2024/10/08/insurance-cuts-driving-score-man-riding-the-beast-kings-island/75554987007/.

65.     Not only were Class Members' pecuniary interests harmed; Defendants' conduct also injured their privacy rights.

66.     As described above, Driver Data can be used to identify individual consumers. The collection and sale of such data constitutes an unwarranted and unauthorized intrusion into the most private areas of a consumer's life and caused, or is likely to cause, substantial injury to consumers and their privacy interests.

67.     Through designing the Arity SDK to routinely transmit users' location data, Defendants collect highly sensitive information from consumers, including where they live, work, worship, send themselves or their children to school or obtain child care, receive medical treatment, go to rallies, demonstrations, or protests, and any other information that can be gleaned from tracking a person's day-to-day movements.

68.     Thus, Defendants' practice of obtaining and using additional data and information concerning consumers, alone and in combination with geo-location data, all without consumers' consent, is likely to result in consumer injury.

69.     The harm suffered by consumers is compounded by the fact that, on information and belief, Defendants retain the consumer location data for years—far beyond what is reasonably necessary—thereby exposing consumers to significant harm.

70.     Once collected and stored, this information can be sold multiple times to companies those consumers have never heard of and never interacted with. Consumers are not able take reasonable steps to avoid the above-described injuries.

## TOLLING OF THE STATUTE OF LIMITATIONS

71.     All applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Class Members could

not have reasonably discovered Defendants' practice of surreptitiously acquiring and compiling their sensitive location data without their consent, selling it to third parties, and/or compiling it in a manner that impacts their insurance premiums—including when the data gathered does not accurately reflect Plaintiffs' or Class Members' driving habits.

72.     Defendants were and remain under a continuing duty to disclose to Plaintiffs and Class Members their practice of acquiring sensitive location data for use in determining insurance premiums. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLASS ALLEGATIONS

73.     Plaintiffs seek relief in her individual capacity and as representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), (b)(3), and (c)(4), Plaintiffs seek certification of the following classes:

> All persons residing in the United States and its territories whose driving information was collected, distributed, stored, and/or sold by Defendants (the "Class").

> All persons and entities in the United States whose vehicle Driver Data was included in consumer reports created and/or disseminated by Arity Defendants (the "FCRA Class").[23]

74.     Excluded from the above Classes are: Defendants, including any entity in which Defendants have a controlling interest, are a parent or subsidiary, or which are controlled by the Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

---

[23] Together, the Class and FCRA Class are hereafter referred to as the "Classes."

75. Plaintiffs reserve the right to amend the Classes as defined above if further investigation and/or discovery reveals that such definitions should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

76. The Classes satisfy the requirements of Federal Rules 23(a): numerosity, commonality, typicality, and adequacy.

77. **Numerosity**. The members of the Classes are so numerous that the joinder of all members is impractical. While the exact number of Class Members is unknown to Plaintiffs at this time, Defendants' misconduct affects millions of drivers.

78. **Commonality**. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants collected Plaintiffs' and Class Members' Driver Data;

b. Whether Plaintiffs and Class Members consented to such collection;

c. Whether Defendants were unjustly enriched;

d. Whether Defendants' conduct constitutes an invasion of privacy;

e. Whether Defendants' conduct was knowing and willful;

f. Whether Defendants' conduct violated the statutes referenced herein;

g. Whether Defendants are liable for damages, and the amount of such damages; and

h. Whether Defendants should be enjoined from such conduct in the future.

79. All members of the proposed Classes are readily ascertainable. In the Driver Data they surreptitiously collected, Defendants have access to the addresses and other contact information for members of the Classes, which can be used for providing notice to many Class Members.

80. **Typicality**. Plaintiffs' claims are typical of those of the Classes in that all were subject to the same data collection, use, and sharing practices of Defendants.

81. **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiffs' Counsel are competent and experienced in litigating class actions, including privacy litigation.

82. The Classes satisfy the requirements of Rule 3(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory relief with respect to Class Members as a whole.

83. The Classes also satisfy the requirements of Federal Rules 23(b)(3): predominance and superiority.

84. **Predominance**. The common issues identified above will predominate over any questions affecting only individual Class Members. In particular, Defendants' liability will be determined by reference to their privacy policies, as well as other common evidence in the form of Defendants' internal records, including financial records, and databases storing Driver Data.

85. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Classes is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

86. Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied without certification of the Classes.

87.     To the extent not all issues or claims, including the amount of damages, can be resolved on a class-wide basis, Plaintiffs invoke Federal Rule of Civil Procedure 23(c)(4), reserving the right to seek certification of a class action with respect to particular issues, and Federal Rule of Civil Procedure 23(c)(5), reserving the right to divide the classes into subclasses. To the extent Plaintiffs seek declarative or injunctive relief, Defendants have acted or refused to act on grounds that apply generally to the class, rendering certification under Rule 23(b)(2) appropriate.

## CAUSES OF ACTION

## COUNT I

### VIOLATION OF THE FEDERAL WIRETAP ACT
### 18 U.S.C. §§ 2510, *et seq.*
### (On Behalf of Plaintiffs and the Class)

88.     Plaintiffs repeat and fully incorporate all factual allegations contained in the paragraphs above as if fully set forth herein.

89.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.

90.     This cause of action arises under the Federal Wiretap Act ("Wiretap Act"), as amended under the Electronic Communications Privacy Act of 1986 ("ECPA"), a federal statute that prohibits third parties from intercepting or disclosing electronic communications without prior authorization.

91.     Specifically, the Wiretap Act prohibits any person from intentionally intercepting, attempting to intercept, or directing another to intercept or attempting to intercept any wire, oral, or electronic communication, as proscribed by 18 U.S.C. § 2511(1)(a).

92.     The Wiretap Act further prohibits the intentional disclosure, or attempted disclosure, of the contents of any wire, oral, or electronic communication, or the intentional use, or attempted use, of such contents, knowing or having reason to know that the information was obtained in violation of the Wiretap Act. 18 U.S.C. § 2511(1)(c) & (d).

93.     The Wiretap Act creates a private right of action to any person whose wire, oral, or electronic communication is unlawfully intercepted, used, or disclosed. 18 U.S.C. § 2520(a).

94.     For the purposes of the Wiretap Act, "intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

95.     The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, […] data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

96.     The Wiretap Act defines "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

97.     The Wiretap Act defines "contents," with respect to any covered communication, to include "any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

98.     The Wiretap Act defines "person" to include "any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

24

99.     Defendant corporations are each a person as defined in 18 U.S.C. §2510(6).

100.    The data and transmissions within, to, and from Plaintiffs' and Class Members' mobile devices constitute "electronic communications," as defined by 18 U.S.C. § 2510(12), as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic or photooptical systems that affect interstate commerce.

101.    As alleged herein, Defendants intercepted, in real time and as it was transmitted, the contents of electronic communications transmitted within, to, and from Plaintiffs' mobile devices and third party apps, and diverted those communications to themselves without consent.

102.    These transmissions were unlawfully acquired by the Defendants by means of the Arity SDK.

103.    The Arity SDK functions by gathering mobile device identifiers and other data from app developers. This information is subsequently provided to Defendants, enabling them to link electronic communications to particular individuals, thereby eliminating anonymity.

104.    Plaintiffs and Class Members have a reasonable expectation of privacy within their vehicles, and Plaintiffs and Class Members reasonably expected privacy while driving their vehicles and using their mobile devices.

105.    Given the prevalent understanding of mobile device functionality, it is reasonably expected that Defendants would refrain from intercepting and redirecting the aforementioned electronic communications.

106.    Defendants further violated the Wiretap Act by intentionally utilizing, or attempting to utilize, the content of the communications detailed herein, with knowledge or reasonable cause to know that the information was acquired through unlawful interception, thereby violating 18 U.S.C. § 2511(1)(a).

107. Specifically, Defendants utilized the intercepted data to price insurance premiums, sell the data to third parties, and for other purposes that materially affected Plaintiffs and the Class Members.

108. Consequently, Plaintiffs and Class Members have experienced damages and injury stemming from the interception, disclosure, and/or unauthorized use of communications encompassing their sensitive Driver Data.

109. Pursuant to 18 U.S.C. § 2520, the Plaintiffs and Class Members are entitled to: (1) appropriate equitable or declaratory relief to prevent future violations of the Federal Wiretap Act; (2) recover damages, including actual damages, Defendants' profits from the unlawful activity, or statutory damages of $100 for each day of violation or $10,000 per Class Member, whichever is greater; and (3) reasonable attorneys' fees and litigation costs.

110. Plaintiffs and the Class seek compensatory, injunctive, and equitable relief, including an award of reasonable attorneys' fees and costs, and punitive or exemplary damages for Defendants' willful and malicious violations of the Federal Wiretap Act, the amount to be determined at proceedings.

## COUNT II

### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. §§ 1030, *et seq.*
### (On Behalf of Plaintiffs and the Class)

111. Plaintiffs repeat and fully incorporate all factual allegations contained in the paragraphs above as if fully set forth herein.

112. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.

113. The Computer Fraud and Abuse Act ("CFAA"), enacted in 1986 as part of the ECPA, makes it illegal to intentional access a computer without authorization or in excess of authorization or beyond what is permitted under certain circumstances. . 18 U.S.C. § 1030(a).

114. The CFAA specifically provides that it is unlawful to "intentionally access a computer without authorization or exceed[] authorized access, and thereby obtain[] . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(c).

115. The CFAA reflects a Congressional determination that computer users possess a legitimate interest in the confidentiality and privacy of their stored information.

116. Plaintiffs, as individuals, and Defendants, as corporations or legal entities, are "persons" within the meaning of the CFAA. 18 U.S.C. § 1030(e)(12).

117. Under the CFAA, a "computer" is defined as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." 18 U.S.C. § 1030(e)(10).

118. Plaintiffs' and Class Members' cellphones are data-processing devices performing logical, arithmetic, and storage functions and thus constitute a "computer" within the meaning of the CFAA. 18 U.S.C. § 1030(e)(1).

119. A "protected computer" is defined as "a computer . . . which is used in or affecting interstate or foreign commerce or communication…, [or that] has moved in or otherwise affects interstate or foreign commerce." 18 U.S.C. § 1030(e)(2)(B).

120. Plaintiffs' and Class Members' mobile devices are used to send and receive information and electronic communications across state lines and internationally. Thus, they constitute "protected computers" within the meaning of the CFAA. 18 U.S.C. § 1030(e)(2)(B).

121.    The CFAA defines "exceeding authorized access" as "access[ing] a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain." 18 U.S.C. § 1030(e)(6).

122.    Without the consent of the Plaintiffs and Class Members, or by exceeding the scope of authorized access, Defendants intentionally accessed Plaintiffs' and Class Members' protected computers (mobile devices) using the Arity SDK and other software. In doing so, they obtained information, which constitutes a violation of the CFAA as prohibited by 18 U.S.C. § 1030(a)(2)(C).

123.    Defendants' conduct constituted a knowing intent to defraud Plaintiffs and Class Members of their valuable Driver Data and profit thereby. 18 U.S.C. §1030(a)(4).

124.    Plaintiffs and Class Members have suffered harm and injury due to Defendants' unauthorized access to the communications containing their private and personal information in the form of Driver Data, as well as Defendants' sale of such information to third parties, including other insurers.

125.    The monetary value of the information Defendants extracted from Plaintiffs' and Class Members' protected computers (mobile devices) surpassed $5,000 within a one-year period. This is substantiated by the significant profits Defendants realized through the disclosure, use, and sale of this information.

126.    A civil action for violation of the CFAA is proper if the conduct involves "loss to 1 or more persons during any 1-year period … aggregating at least $5,000 in value." Because the loss to Plaintiffs and Class Members during any one year period within the relevant timeframe, including the loss of their privacy interest in and control over their Driver Data, exceeded $5,000 in aggregate, Plaintiffs and the Class are entitled to bring this civil action and are entitled to economic damages, compensatory damages, injunctive, equitable, and all available statutory relief,

as well as their reasonable attorney's fees and costs and other relief as permitted by the CFAA. 18 U.S.C. § 1030(g).

**COUNT III**

**VIOLATION OF THE STORED COMMUNICATIONS ACT**
**18 U.S.C. §§ 2701, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

127.    Plaintiffs repeat and fully incorporate all factual allegations contained in the paragraphs above as if fully set forth herein.

128.    The Federal Stored Communications Act ("SCA"), enacted in 1986 as part of the Electronic Communications Privacy Act ("ECPA"), creates a civil remedy for those whose stored electronic communications have been "accessed intentionally without authorization" or has "intentionally exceeded an authorization to access," a facility which has been provided through an electronic communication service ("ECS"). 18 U.S.C. §§ 2701, 2707.

129.    Congress's judgment that users have a legitimate interest in the confidentiality and privacy of communications in electronic storage is reflected in the Act.

130.    "Electronic communication" is defined as "any transfer of signs, signals, . . . data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

131.    "Electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

132.    "Electronic storage" is defined as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any

storage of such communication by an electronic communication service for purposes of backup protection of such communication . . . ." 18 U.S.C. §§ 2510(17).

133. Plaintiffs, as individuals, and Defendants, as corporations or legal entities are defined as "persons" within the meaning of 18 U.S.C. § 2510(6), and for purposes of 18 U.S.C. § 2707.

134. The data and transmissions within, to, and from Plaintiffs' and Class Members' are defined as "electronic communications," within the meaning of 18 U.S.C. § 2510(12), as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic or photo optical systems that affect interstate commerce.

135. Defendants' Arity SDK, intercepted Plaintiffs' and Class Members' communications, and stored their communications on their own servers, unbeknownst to Plaintiffs and Class Members.

136. As detailed herein, the electronic communications Defendants intercepted and stored are tied to individuals and are de-anonymized.

137. Based on a reasonable expectation and understanding, Plaintiffs and Class Members expected privacy while driving their vehicles and while using their cell phones.

138. Plaintiffs and Class Members did not authorize Defendants to access their phones or the communications stored within them.

139. Plaintiffs and Class Members were unaware and could not have reasonably expected that software on their cell phones would transmit and track their communications and share their Driver Data with third parties.

140.    Defendants have intentionally intercepted the communications described above in violation of 18 U.S.C. §2511(1)(a). 18 U.S.C. §2511(1)(d) and have intentionally exceeded their authority to access these unauthorized communications.

141.    By accessing Plaintiffs' and Class Members' private communications and data without consent, the Defendants have violated the SCA, 18 U.SC. § 2701. Defendants' conduct was intentional and willful as they had invaded the Plaintiffs' and Class Members' expectations of privacy.

142.    Plaintiffs and Class Members lost the value of their data, their privacy interest in the data, and their control over their data's use.

143.    Defendants have profited from their violation of the SCA, by, among other things, using improperly accessed communications and highly sensitive Driver Data for Defendants' commercial gain and benefit.

144.    Because Plaintiffs and Class Members have been aggrieved by Defendants' conduct, they are entitled to bring this civil action to recover damages and relief. 18 U.S.C. § 2707.

145.    Plaintiffs and Class Members are entitled to compensatory damages, injunctive and equitable relief, reasonable attorneys' fees and costs, statutory relief and punitive damages determined by the Court.

## COUNT IV

**VIOLATION OF THE FAIR CREDIT REPORTING ACT**
**18 U.S.C. §§ 2701, *et seq.***
**(On Behalf of Plaintiffs and the FCRA Class against Arity Defendants)**

146.    Plaintiffs repeat and fully incorporate all factual allegations contained in the paragraphs above as if fully set forth herein.

147.    Arity Defendants are consumer reporting agencies under the FCRA. As per the FCRA, "a consumer reporting agency" includes any individual who, for monetary fees or on a cooperative nonprofit basis, engages regularly in the practice of furnishing consumer credit reports to third parties and at all relevant times, the Defendant has been a consumer reporting agency.

148.    As defined by the FCRA, a "consumer report" refers to any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or lifestyle. This data is used, expected to be used, or collected, in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for (i) credit or insurance to be used primarily for personal, family, or household purposes, (ii) employment purposes, or (iii) any other purpose authorized by 15 U.S.C. § 1681(b). At all relevant times, Arity Defendants had compiled and maintained "consumer reports" on Plaintiffs and FCRA Class Members. 15 U.S.C. § 1681a(d)(1).

149.    Arity Defendants were required to monitor systems to ensure that the information available with them was accurate, including Plaintiffs' and FCRA Class Members' Driver Data.

150.    Driver behavior data was collected by Arity Defendants and shared with Allstate Defendants, who furnished it to third parties, including automobile insurers without full knowledge and consent from Plaintiffs and other FCRA Class Members.

151.    Arity Defendants' conduct of providing credit information, which includes driver behavior data to third parties, including automobile insurance companies, constituted an impermissible use of data under the FCRA.

152. The FCRA requires credit reporting agencies to adopt reasonable procedures to ensure the "maximum possible accuracy" of the consumer credit information it furnishes. 15 U.S.C. § 1681e(b).

153. Plaintiffs and FCRA Class Members were significantly harmed by Arity Defendants, as misleading and personal driving information was disseminated in the consumer reports, which led to the raising their insurance premium significantly and/or the denial of coverage.

154. As a result of Arity Defendants' inaccurate representation of Plaintiffs' and FCRA Class Members' driving abilities, insurance carriers and others viewed and relied on inaccurate consumer reports.

155. Inaccurate data metrics regarding Plaintiffs' and FCRA Class Members' driving abilities were knowingly and willfully collected by Arity Defendants. Those actions have included, among other things as alleged herein:

a. Misreporting Driver Data and associating the data with the wrong individual; and

b. Continuing to misreport Driver Data even when Arity Defendants were aware that the systems developed to collect and report such information is prone to errors, fails to correctly report Driver Data, provides no context for certain Driver Data, and lacks any mechanisms to verify correct data.

156. Plaintiffs and FCRA Class Members are entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(1); statutory damages pursuant to 15 U.S.C. § 1681n(a)(1); punitive damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) for each and every willful violation of the FCRA.

## COUNT V

### INVASION OF PRIVACY
### (On Behalf of Plaintiffs and the Class)

157.     Plaintiffs repeat and fully incorporate all factual allegations contained in the paragraphs above as if fully set forth herein.

158.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.

159.     Plaintiffs and Class Members have a legally protected right to privacy concerning their Driver Data and are entitled to the protection of their Driver Data against unauthorized acquisition and use.

160.     Plaintiffs and Class Members harbor a reasonable expectation that their driving abilities, patterns, habits, and behaviors, as exhibited within their personal vehicles, will remain private. Furthermore, they reasonably expect that compilations of highly personalized driving profiles derived from the collection of such data will also be protected from unauthorized access.

161.     Unbeknownst to Plaintiffs and Class Members, as they operate their vehicles for routine activities such as commuting, visiting family, or running errands, they generate extensive amounts of sensitive data that map their personal lives. This data is then systematically collected, captured, transmitted, accessed, compiled, stored, analyzed, and sold without their awareness or informed consent.

162.     The continued nonconsensual surveillance of an individual in their private capacity, as Defendants have done and continue to do, represents a fundamental violation of personal privacy, freedom, and autonomy. It is not simply an intentional intrusion but a profound and egregious infringement upon the most personal and sacred aspects of one's life. Plaintiffs and

Class Members have unknowingly been subjected to constant observation while they use their mobile devices every day, which destabilizes the very essence of personal liberty.

163. As a result of Defendants' intentionally intrusive conduct, Plaintiffs and Class Members have been and remain today under pervasive surveillance compromising their privacy, autonomy, and basic human dignity that our society relies upon and expects.

164. Plaintiffs and Class Members have a reasonable expectation that data regarding their locations, driving abilities, patterns, decisions, and habits engaged in while they are in their own vehicles would not be collected by Defendants without their express consent, and that such data would not be shared with or used by third parties without their express consent.

165. Without the consent or knowledge of Plaintiffs and Class Members, Defendants collected comprehensive Driver Data that Plaintiffs and Class Members reasonably expected to remain private.

166. Defendants then disclosed this highly personal and sensitive information to third parties, who used the information for commercial gain.

167. Defendants intentionally invaded Plaintiffs' and Class Members' privacy interests by deliberately designing the Arity SDK and programs that surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell their confidential driving history.

168. The actions taken by Defendants are deeply offensive when viewed through the lens of a reasonable individual and represent a severe violation of societal standards that protect privacy rights. This assertion is supported by extensive scholarly studies, publications, and regulatory actions, as well as investigative endeavors aimed at safeguarding consumer privacy from concealed technological encroachments.

169.     Defendants, by engaging in the unauthorized and non-consensual tracking, collection, storage, distribution, and sale of the Plaintiffs' and Class Members' Driver Data, purposefully encroached upon their right to seclusion, solitude, and private life, which they expected to conduct within the privacy of their vehicles, all without their awareness or authorization.

170.     As a result of the Defendant's conduct, Plaintiffs and Class Members suffered an infringement on their privacy entitlements, which involved:

     a.     The unauthorized circulation and/or misuse of their Driving Data;

     b.     The prevention of maintaining autonomy over the data that the Arity SDK tracks; and

     c.     The obstruction of making personal choices and/or participating in private activities without being monitored, intruded upon, or interfered with, notably encompassing the ability to operate a vehicle without the unauthorized interception and public dissemination of their Driver Data without their explicit knowledge or agreement.

171.     Defendants, by disseminating Plaintiffs' and Class Members' Driver Data in a manner that was fundamentally misleading and distorted, providing an inaccurate portrayal of their driving incidents and capabilities, demonstrated a reckless lack of concern for their privacy entitlements, deliberately and illegally violated their right to seclusion, and revealed their private information, which was both incorrect and misleading.

172.     Defendants' actions have unlawfully facilitated access to the Plaintiffs' and Class Members' Driver Data by external entities without obtaining proper consent. Moreover, no remuneration or benefit was extended to Plaintiffs and Class Members in exchange for the

unauthorized utilization of their Driver Data. Consequently, Defendants denied Plaintiffs and Class Members the authority to govern the methods by which their Driver Data is acquired, employed, or circulated, and to determine the parties involved in such processes.

173.    Defendants, by infringing upon the privacy of Plaintiffs and Class Members and utilizing their Driver Data for its inherent economic value have unjustly enriched themselves for their own commercial advantage.

174.    Due to the Defendants' direct and proximate result of illegal intrusions on their privacy, Plaintiffs and Class Members experienced a diminishment, misuse, compromise, and ultimate failure of their legitimate expectations of privacy.

175.    Defendants' actions caused harm to Plaintiffs and Class Members, resulting in the impairment of their privacy and the confidentiality of their personal activities conducted within their vehicles. By obtaining their driving-related information through their connected services, Defendants have caused unnecessary harm. This intrusion, the dissemination of private information, and the loss of privacy has resulted in mental distress, real damages, a diminution in the value of personal data, and a violation of their personal privacy, the financial impact of which will be ascertained during the trial.

176.    Absent an injunction and restraint ordered by this Court, Defendants' unlawful actions will continue to inflict lasting harm on Plaintiffs and Class Members. This harm stems from the fact that their driving-related information, currently held by Defendants, may be accessed, disseminated, and exploited by unauthorized entities for an extended period in the future.

177.    Consequently, Plaintiffs and the Class request nominal damages, compensation for losses, and exemplary damages stemming from Defendants' conduct. Plaintiffs seek recovery for actual damages incurred, together with any profits Defendants derived from their utilization of

Plaintiffs' and the Class's driving information. Exemplary damages are justified because Defendants' behavior was characterized by malice, oppression, and willful disregard of their legal obligations. Furthermore, such damages are essential to prevent Defendants from engaging in comparable wrongful actions going forward.

## COUNT VI

### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

178. Plaintiffs repeat and fully incorporate all factual allegations contained in the paragraphs above as if fully set forth herein.

179. Plaintiffs bring this claim in the alternative to any legal claims that may be alleged.

180. Plaintiffs and Class Members seek to prevent Defendants from the misuse and dissemination of their physical location and personal data to third parties and protecting the use of their personal property from unauthorized observation or interference by Defendants.

181. Defendants designed the Arity SDK and embedded it in third party apps, by means of which they obtained Plaintiffs' and Class Members' Driving Data for their own commercial use and for sale. By driving their vehicles, Plaintiffs and Class Members unknowingly conferred the benefit of their Driving Data on Defendants.

182. Defendants knew and appreciated this benefit, by gaining access to Plaintiffs' and Class Members' valuable Driver Data and using the data for their commercial advantage – to price insurance products and offer other products and services, and to sell this data to other insurers.

183. Defendants sold this highly sensitive collected data to third parties without lawfully obtaining consent from Plaintiffs and Class Members.

184. Plaintiffs and Class Members lack an adequate remedy at law as they have received nothing from this unjust transaction. In the alternative, Plaintiffs and Class Members plead this cause of action to the extent required.

185. By retaining the revenues derived from the sale of Plaintiffs' and Class Members' personal data and physical locations, Defendants have been unjustly enriched. Defendants have failed to obtain the lawful and meaningful consent of Plaintiffs and Class Members before selling their personal data to third parties and thus the money which has been retained under these circumstances is unjust and inequitable.

186. Plaintiffs and Class Members should be paid restitution by Defendants, as Defendants received non-gratuitous benefits from Plaintiffs and Class Members.

187. Unlike damages, restitution is not merely confined to the amount of money a defendant wrongfully acquired plus the legal rate of interest. Instead, the Plaintiffs are entitled to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest, through equitable relief.

188. As a result of Defendants' unjust conduct, Plaintiffs and Class Members seek non-restitutionary disgorgement of Defendants' financial profits.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the proposed Classes, respectfully requests that this Court enter judgment in their favor and against Defendants as follows:

(a) For an Order certifying the Classes as defined herein, and appointing Plaintiffs and their counsel to represent the Classes;

(b) For permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

(c) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

(d) For an award of actual, statutory, and compensatory damages, in an amount to be determined;

(e) For an award of pre-judgment and post-judgment interest as allowed by law;

(f) For an award of costs of suit and attorneys' fees, as allowable by law; and

(g) Such other and further relief as this court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury for all issues so triable.

Dated: February 12, 2025

Respectfully submitted,

By: */s/ Nicholas R. Lange*
    Nicholas R. Lange

**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60629
Telephone: 224.632.4500
Email: nlange@fklmlaw.com

*Local Counsel for Plaintiffs*

**LEVI & KORSINSKY, LLP**
Mark S. Reich*
Colin A. Brown*
Alyssa Tolentino*
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Emails: mreich@zlk.com
       cbrown@zlk.com
       atolentino@zlk.com

*pro hac vice* forthcoming

*Counsel for Plaintiffs*